**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TAMARA RUBIO, *on behalf of herself and all others similarly situated,*<br>Plaintiff,<br><br>vs.<br><br>FIVE BELOW, INC.,<br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Tamara Rubio, individually and on behalf of all others similarly situated, brings this class action lawsuit against Defendant Five Below, Inc. ("Five Below," or "Defendant"), and alleges the following based upon personal knowledge as to herself and her actions, knowledge, and experiences, and upon information and good faith belief as to all other matters.

## INTRODUCTION

1. This class action lawsuit challenges Five Below's practice of secretly intercepting and transmitting the private communications, shopping and browsing activity, and personal data of the users of its mobile applications—the Five Below iOS and Android applications (each, an "App," and collectively, the "Apps")[1]—to undisclosed third parties Meta Platforms, Inc. ("Meta" or "Facebook"), TikTok USDS Joint Venture, LLC ("TikTok"), and LogRocket, Inc. ("LogRocket"), through the Facebook Pixel, the Facebook Software Development Kit ("Facebook SDK"), the TikTok Pixel, and the LogRocket session replay software embedded in the Apps (collectively, the "Tracking Technologies"), without the knowledge or consent of its users.

[1] Unless otherwise indicated, allegations concerning the Apps are based on Plaintiff's last use of the Apps in July 2026 and, on information and belief, on all prior versions of the Apps and their structure as of that time, and not necessarily on any subsequently updated versions of the Apps.

2. Five Below operates a nationwide chain of discount retail stores together with an online and mobile retail marketplace, through which it markets and sells beauty and personal-care products, apparel, accessories, home goods, toys, food, seasonal merchandise, and other consumer products directly to consumers.

3. Five Below's users provide personally sensitive information including personally identifiable information, the specific products they browse and view, the search queries they run, the contents of their shopping carts, the items they purchase and the amounts they pay, their billing information, their shipping and home addresses, their geographic location, and their cumulative purchase history (collectively, the "Sensitive Information").

4. Users of the Apps reasonably expect that the Sensitive Information that they provide to Five Below will remain private and confidential, visible only to Five Below.

5. Five Below maintains a written privacy policy that purports to describe its collection, use, and disclosure of user data (the "Privacy Policy").

6. However, a consumer who downloads the Five Below App from the Apple App Store or the Google Play Store and uses it to shop is not presented with the Privacy Policy at any point.

7. Nor is the Privacy Policy displayed on the App's store listing page, or on first launch.

8. At no point is a user shown the Privacy Policy, required to scroll through it, or required to acknowledge it as a condition of using the Apps.

9. Without providing adequate notice, Five Below embeds third-party Tracking Technologies within the Apps, including the Facebook Pixel and Facebook SDK, the TikTok Pixel, and the LogRocket session replay software, which secretly intercept and transmit, in real

time, the contents of users' product searches, browsing activity, cart activity, and checkout submissions, along with unique persistent identifiers, to Meta, TikTok, and LogRocket for advertising, analytics, and profiling purposes.

10. Together, the Facebook and TikTok trackers capture a user's entire journey through the Apps.

11. Each time Plaintiff or a Class member opens the Apps, views a page or product listing, taps a control, adds an item to a cart, or completes a purchase, the embedded Tracking Technologies transmit to Meta, TikTok, and LogRocket:

a. the precise URL of the page or listing (which, in the case of a listing, identifies a single item offered for sale);
b. the title of that page or listing, including the product name and category;
c. the action the user took—page view, click, cart addition, and purchase—and, in the case of a click, the literal on-screen text of the control the user pressed;
d. persistent identifiers that uniquely identify the user across sessions and properties; and
e. session and page-view identifiers that permit the recipient to sequence those events into a continuous, ordered record of the visit.

12. These transmissions occur without the requisite notice and consent.

13. Five Below has also embedded within the Apps session replay software supplied by LogRocket. From the moment a user opens the Apps, and throughout every subsequent session, that software records every screen the user views and every tap, swipe, scroll, and entry the user makes—the functional equivalent of a video recording of the user's entire shopping session—and transmits that recording to LogRocket's servers, where Five Below and LogRocket can search, filter, and replay it at will.

14. Like the Facebook and TikTok transmissions, this recording occurs without any notice to the user and without the user's consent. Nothing in the Apps informs the user that a session replay tool is running, identifies LogRocket, or offers the user any means of declining to be recorded.

15. The LogRocket session replay software thus captures essentially everything a user does in the Apps, from the moment the user opens them until the moment the user closes them.

16. These transmissions, when aggregated, disclose an extraordinarily sensitive portrait of each user, including:

a. The specific products and product categories the user browses;
b. The specific items the user adds to a cart and the items the user actually purchases;
c. The prices the user is willing to pay and the amounts the user spends;
d. The user's household composition, life events, and personal circumstances inferable from the merchandise viewed—including pregnancy and infant care, the ages of the user's children, health and personal-care needs, and religious observance;
e. The frequency and intensity of the user's shopping activity; and
f. The user's geographic location and shipping address.

17. Meta and TikTok then combine this information with the comprehensive profiles they already maintain about each user from their own services and from the millions of other applications and websites in which Meta, TikTok, and other third parties' tracking code is embedded, to build, refine, and monetize cross-platform behavioral profiles that are then offered to third-party advertisers.

18. The nonconsensual disclosure or mishandling of this data causes concrete and irreversible harm.

19. Shopping and purchase histories are among the most revealing categories of consumer data: what a person buys discloses that person's health conditions, family circumstances, religious practice, financial condition, and intimate personal habits.

20. Disclosure of that data to advertising platforms enables surveillance advertising, behavioral price discrimination, and the targeting of users identified as financially distressed or otherwise vulnerable.

21. Because retail purchase data touches on the household autonomy and economic circumstances of the individual, Defendant's obligation to safeguard it was correspondingly grave.

22. Five Below cannot credibly claim that its users agreed to any of this.

23. The only terms Five Below purports to present to users of the Apps—those referenced on the App's download and first-launch screen and again at checkout—are, as described above and in further detail *infra*, not enforceable.

24. Because the terms were never presented with reasonably conspicuous notice, because no user can review terms that cannot be opened, and because no user can manifest assent to terms that cannot be accepted, Five Below's purported terms of use (the "Terms of Use"), arbitration provision, class-action waiver, limitation of liability, and any consent-based defense premised on those terms are unenforceable for lack of mutual assent.

25. Five Below's secret interception and transmission of users' private communications and personal information to Meta, TikTok, and LogRocket violates the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511, 2520 ("ECPA"); the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. §§ 5701, et seq. ("WESCA"); the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq. ("CIPA"); the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL"); and constitutes intrusion upon seclusion, invasion of privacy, and unjust enrichment.

**PARTIES**

26. Plaintiff Tamara Rubio is a natural person who, at all times relevant to this litigation, has resided (and continues to reside) in Downey in Los Angeles County, California.

27. Defendant Five Below, Inc. is a corporation incorporated in the Commonwealth of Pennsylvania, with its principal place of business at 701 Market Street, Suite 100 in Philadelphia, Pennsylvania 19106.

28. Defendant owns and operates the Apps, through which it transacts business with consumers residing throughout the United States, including in California; it also operates a nationwide chain of retail stores.

29. Defendant designs, develops, operates, and maintains the Apps, and controls the third-party software embedded in them, from its corporate headquarters in Philadelphia, Pennsylvania. On information and belief, the decisions to embed the Tracking Technologies within the Apps, to configure them as alleged herein, and to enter into the agreements with Meta, TikTok, and LogRocket under which those companies receive App users' data were made by Defendant's personnel in Philadelphia, and the data those companies return to Defendant is received, reviewed, and used by Defendant in Philadelphia.

## JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) this is a class action lawsuit in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) there are more than 100 members of the proposed class; and (c) at least one member of the proposed class, including Plaintiff, is a citizen of a State (California) different from Defendant.

31. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises in part under the laws of the United States, specifically the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511, 2520.

32. The Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

33. This Court has general personal jurisdiction over Defendant because Defendant is incorporated in the Commonwealth of Pennsylvania and maintains its principal place of business

in Philadelphia, Pennsylvania, within this District, and is therefore "at home" in this forum. This Court also has specific personal jurisdiction over Defendant because the conduct giving rise to the claims alleged herein—including Defendant's design, development, and maintenance of the Apps, its decisions to embed the Tracking Technologies within the Apps and to configure them to intercept and transmit users' communications, and its receipt and use of the intercepted data—was undertaken at and directed from Defendant's headquarters in this District.

34. Defendant's tortious conduct, including its embedding of the Facebook, TikTok, and LogRocket Tracking Technologies within the Apps to intercept the communications of users throughout the United States, including Plaintiff, emanated from this District. Defendant's contacts with the forum are such that it should reasonably anticipate being haled into court here.

35. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District: Defendant is incorporated in Pennsylvania, maintains its principal place of business in Philadelphia, and is subject to personal jurisdiction here. See 28 U.S.C. § 1391(c)(2), (d). Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Defendant's design, development, and maintenance of the Apps; its decisions to embed the Tracking Technologies within the Apps and to configure them to intercept and transmit users' Sensitive Information; and its receipt and use of the intercepted data, each of which occurred at or was directed from Defendant's Philadelphia headquarters.

## FACTUAL ALLEGATIONS

### *A. Five Below's Apps and Its Users.*

36. Five Below operates a nationwide retail business through its physical stores and through its online presence.

37. Five Below, through the Apps, allows users to browse and search a catalog of merchandise by product name, category, keyword, and price; to view the details of individual product listings; to add items to a shopping cart; and to purchase items directly through the Apps.

38. Five Below holds itself out as a consumer-facing retailer of value-priced merchandise. Its Apps are offered to users at no charge; Five Below monetizes the Apps through the sale of merchandise to consumers and through advertising and analytics relationships that Five Below has not disclosed to its users.

39. Each time a user loads a specific product listing, the user's mobile application transmits a request to Five Below's servers identifying the specific item the user wishes to view, and Five Below's servers return the listing's content—the product name, the category, the description, the price, availability, and related fields. The URL or screen identifier of the listing itself maps one-to-one to a single item offered for sale.

40. The content of a user's engagement with the Apps—including which products the user is researching, which items the user is interested in, how long the user considers each listing, whether the user scrolls through the full description, whether the user adds the item to a cart, and whether the user completes a purchase—is the kind of information that a reasonable user would expect to remain confidential between the user and Five Below.

41. Retail shopping and purchase activity reveals far more than consumers typically appreciate. The specific products a person browses and buys are used to infer sensitive characteristics such as health conditions, income, religion, and political leanings. That activity, including the prices that person is willing to pay, is also used to set individualized prices. Transaction data resists anonymization: four purchases are enough to reidentify 90% of individuals

in a de-identified dataset. Disclosure of this information to advertising platforms, data brokers, or other unrelated third parties can therefore cause substantial economic and reputational harm.[2]

42. California law recognizes that consumer purchase and browsing information is protected personal information subject to transparency obligations. Businesses collecting personal information from consumers must provide notice, at or before the point of collection, identifying the categories of personal information collected and the purposes for which such information will be used, and must further disclose the categories of third parties to whom such information is disclosed, shared, or otherwise transmitted. *See* Cal. Civ. Code §§ 1798.100(a)(1), 1798.110(c)(4).

43. California further affords heightened protection to "sensitive personal information," including precise geolocation and information concerning health, sex life, and religious beliefs, each of which is directly inferable from the merchandise a consumer browses and purchases. *See* Cal. Civ. Code § 1798.140(ae).

---

[2] *See* Fed. Trade Comm'n, *Data Brokers: A Call for Transparency and Accountability* iv–vi, 13–14 (May 2014), https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf (finding that data brokers obtain transaction-level purchase data from retailers, including product type, dollar amount, and date, and use it to infer potentially sensitive characteristics, including health-related categories such as "Expectant Parent" and "Diabetes Interest"); Fed. Trade Comm'n Staff, *FTC Surveillance Pricing 6(b) Study: Research Summaries—A Staff Perspective* 5–8 & n.39 (Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/p246202_surveillancepricing6bstudy_researchsummaries_redacted.pdf (describing tools that use consumers' purchase history and shopping behavior to estimate price sensitivity and "willingness to pay" and to generate personalized prices); Yves-Alexandre de Montjoye et al., *Unique in the Shopping Mall: On the Reidentifiability of Credit Card Metadata*, 347 Science 536, 536 (2015) (finding that four spatiotemporal points were enough to uniquely reidentify 90% of individuals in three months of credit card records for 1.1 million people, and that knowing transaction prices increased reidentification risk); *see also* Press Release, Fed. Trade Comm'n, FTC Surveillance Pricing Study Indicates Wide Range of Personal Data Used to Set Individualized Consumer Prices (Jan. 17, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer.

44. Federal agencies have also recognized that online and mobile retail browsing and purchase activity is sensitive data whose unauthorized use or sharing can cause material harm.

45. The Federal Trade Commission, the Consumer Financial Protection Bureau, and the California Privacy Protection Agency have all flagged the risks posed by advertising platforms' collection of retail purchase and browsing signals, including the risk that such data is used to infer sensitive characteristics about consumers and to deliver differential pricing and predatory advertising to particular classes of users.[3]

***B. Five Below's Secret Use of the Facebook, TikTok, and LogRocket Tracking Technologies.***

46. Unbeknownst to its users, Five Below has embedded third-party tracking code and software development kits within its Apps.

47. These are third-party software tools that intercept, copy, and transmit to Meta, TikTok, and LogRocket the contents of users' private communications with Five Below. These transmissions include the specific product listings users view, the searches users run, the items users add to their carts, and the purchases users complete, and—in the case of LogRocket—a continuous recording of every screen the user views and every tap, swipe, scroll, and entry the user makes within the Apps.

48. These third-party tools operate silently, in the background, without any visible indication to the user, and without any mechanism by which the user can consent to or opt out of them before they begin transmitting data.

***i. The Facebook Tracking Technology.***

[3] *Joint Statement on Enforcement Efforts Against Discrimination and Bias in Automated Systems*, EEOC, CRT, FTC, and CFPB (Apr. 25, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/joint-statement-enforcement-efforts-against-discrimination-bias-automated-systems

49. The Facebook Pixel is a tracking pixel developed and operated by Meta Platforms, Inc. that website operators embed on their properties to transmit user-activity data to Meta.

50. The Facebook SDK is its mobile equivalent, a software library that mobile-application developers embed directly into the source code of their applications and that transmits data to Meta's servers, including through the Facebook Graph API endpoint (ep1.facebook.com) and the Facebook collection endpoint at www.facebook.com/tr/.[4]

51. Meta's Pixel and SDK tools collect data about user activity inside the host property and transmit it to Meta's servers, where it feeds into Meta's advertising platform.[5]

52. The Facebook Pixel and SDK automatically collect and transmit, among other data: (a) a unique Pixel ID ("id") that identifies the property being tracked; (b) a persistent Facebook browser identifier ("fbp") that Meta stores in a first-party cookie on the property and that uniquely identifies the user across sessions; (c) where a Facebook account is associated with the device, a click identifier ("fbc") and the user's Facebook identity; (d) standard Facebook Events including "PageView," "ViewContent," "Search," "AddToCart," "InitiateCheckout," "AddPaymentInfo,"

---

[4] *See Meta Pixel, Meta for Developers*, https://developers.facebook.com/docs/meta-pixel/ (last visited Sept. 28, 2026); Facebook SDK for iOS, Meta for Developers, https://developers.facebook.com/docs/ios (last visited Sept. 28, 2026).

[5] *See Get Started — Meta Pixel, Meta for Developers*, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Sept. 28, 2026) (Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts"); *see also Track Multiple Events with Meta* Pixels, https://developers.facebook.com/docs/meta-pixel/guides/track-multiple-events (describing how Facebook tracking tools can be designed to track specific user interactions with an app or website) (last visited Sept. 28, 2026).

and "Purchase"; (e) the full URL of the page being viewed ("dl"); (f) the title and description of the page; (g) device and browser fingerprinting data; and (h) the user's IP address.[6]

53. Once user data is received by Meta's servers through the Pixel or SDK, Meta incorporates that data into its advertising ecosystem and uses it for its own independent commercial purposes, including: (a) Custom Audiences, which allow advertisers to target users who have engaged with specific content on the Apps; (b) Lookalike Audiences, which identify users who share behavioral characteristics with App users; (c) ad optimization and targeting; and (d) attribution and measurement across Facebook, Instagram, and the Meta Audience Network.[7]

---

[6] *See Conversion Tracking — Meta Pixel, Meta for Developers*, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited Sept. 28, 2026); *Meta Pixel, Meta for Developers*, https://developers.facebook.com/docs/meta-pixel/ (last visited Sept. 28, 2026) (data collected includes "Pixel ID and the Facebook Cookie").

[7] *See About Custom Audiences*, https://www.facebook.com/business/help/744354708981227 (last visited Sept. 28, 2026); *About Lookalike Audiences,* https://www.facebook.com/business/help/164749007013531 (last visited Sept. 28, 2026); *Meta Audience Network*, https://www.facebook.com/audiencenetwork/ (last visited Sept. 28, 2026).

```
GET https://www.facebook.com/tr/?id=1787661074876741&ev=PageView&dl=https%3A%2F%2Fww
w.fivebelow.com%2Fcategories%2Fback-to-school%2Fclassroom-ready%2Fschool-supplies-bac
k-to-school&rl=https%3A%2F%2Fwww.fivebelow.com%2F&if=false&ts=1784040077921&iw=false&
sw=402&sh=874&v=2.9.353&r=stable&ec=0&o=12318&aems=0%3B0&fbp=fb.1.1784040039993.45416
3249954704140&ler=empty&pmd[title]=Back%20To%20School%20Supplies%2C%20Stuff%2C%20and%
sec-fetch-dest: image
user-agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_7 like Mac OS X) AppleWebKit/605.1.15
(KHTML, like Gecko) Mobile/15E148 is_5b_mobile_app HideHeader ios:1
accept: image/webp,image/avif,image/jxl,image/heic,image/heic-
sequence,video/*;q=0.8,image/png,image/svg+xml,image/*;q=0.8,*/*;q=0.5
referer: https://www.fivebelow.com/
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
accept-language: en-US,en;q=0.9
priority: u=3, i
accept-encoding: identity

id: '1787661074876741'
ev: PageView
dl:
  https://www.fivebelow.com/categories/back-to-school/classroom-ready/school-supplies-back-
rl: https://www.fivebelow.com/
if: 'false'
ts: '1784040077921'

id: '1787661074876741'
ev: SubscribedButtonClick
dl: https://www.fivebelow.com/categories/beauty/makeup/lip-gloss
rl: ''
if: 'false'
ts: '1784040393734'
iw: 'false'
cd[buttonFeatures]: '{"classList":"mb-16 mt-28 h-[40px] w-[232px] bg-fivebelow-black
  p-10 text-14 font-medium text-white","destination":"","id":"","imageUrl":"","innerText":"Go
  back home","numChildButtons":0,"tag":"button","type":null,"name":"","value":""}'
cd[buttonText]: Go back home
cd[formFeatures]: '[]'
cd[pageFeatures]: '{"title":"Lip Gloss, Lip Balm & Lip Oil | Five Below"}'
sw: '402'
sh: '874'
```


54. As shown above, Five Below has embedded the Facebook Pixel (id=1787661074876741) within its Apps. Network traffic captured from a user's interaction with the Five Below iOS application shows the Apps transmitting to https://www.facebook.com/tr/, among other data:

a. id=1787661074876741, which is Five Below's unique Facebook Pixel ID;
b. ev=PageView and ev=SubscribedButtonClick, which identify the Facebook events being transmitted—the first reporting that the user has loaded a page of the App, the second reporting that the user has pressed a control within it;
c. dl=, which carries the URL-encoded address of the page or product listing the user is viewing—in the captured transmissions, https://www.fivebelow.com/categories/back-to-school/classroom-ready/school-supplies-back-to-school and https://www.fivebelow.com/categories/beauty/makeup/lip-gloss—together with

rl=https://www.fivebelow.com/, which discloses the page from which the user navigated;

d. fbp=fb.1.1784040039993.454163249954704140, a persistent Facebook browser identifier that uniquely identifies the user to Meta across sessions and across properties;

e. pmd[title] and cd[pageFeatures], which transmit the title of the page the user is viewing—in the captured transmissions, "Back To School Supplies, Stuff, and . . ." and {"title":"Lip Gloss, Lip Balm & Lip Oil | Five Below"}—and thereby disclose the merchandise category the user is shopping;

f. cd[buttonText] and cd[buttonFeatures], which transmit the literal on-screen text of the control the user pressed and that control's document-object-model attributes, including its class list, tag, and destination;

g. device and application identifiers, including a screen width of sw=402 and a screen height of sh=874, the user agent "Mozilla/5.0 (iPhone; CPU iPhone OS 18_7 like Mac OS X) . . . is_5b_mobile_app," which identifies the Five Below mobile application as the originating application, and a referer and origin of https://www.fivebelow.com, confirming that the Pixel is being triggered from Five Below's Apps.

55. This transmission occurs in real time and without any intervening notice to the user.

56. Every view of every product listing in Five Below's Apps is mirrored to Meta's servers, together with a persistent identifier that enables Meta to link that view to the user's Facebook, Instagram, and Meta Audience Network identity.

57. The Facebook Pixel and Facebook SDK are configured throughout Five Below's Apps and web properties to transmit additional Facebook Standard Events to Meta, including "ViewContent" (to capture product-listing views), "Search" (to capture searches the user runs on the Apps), "AddToCart" and "InitiateCheckout" (to capture cart and checkout activity), "Purchase" (to capture completed transactions and their value), and "CompleteRegistration" (to capture account signups), each of which is transmitted together with the persistent "fbp" identifier.

58. This configuration enables Meta to construct a chronological record of every search, product view, cart addition, and purchase a user has performed on the Apps.[8]

[8] *See Conversion Tracking — Meta Pixel, Meta for Developers*, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-

59. Meta uses the data it receives from the Apps for its own independent commercial purposes, including to associate the user's shopping and browsing activity with the user's Facebook or Instagram identity, to power Meta's advertising products (including the Custom Audiences and Lookalike Audiences features), and to refine the user's behavioral profile on Meta's platform. None of these uses is disclosed in Five Below's Privacy Policy.

***ii. The TikTok Tracking Technology.***

60. The TikTok Pixel is a tracking technology developed and operated by TikTok USDS Joint Venture, LLC, which website and application operators embed in their properties in order to transmit user-activity data to TikTok.

61. It is delivered as a JavaScript library ("pixel.js") that loads within the host property and transmits the events it captures to TikTok's collection endpoint at analytics.tiktok.com.[9]

62. The TikTok Pixel is not limited to page views. TikTok instructs advertisers deploying the Pixel to configure events spanning what TikTok itself calls "a full customer journey" across the advertiser's property—from the viewing of a product detail page, to the addition of an item to a cart, to the completion of a purchase.

63. TikTok further documents that the Pixel collects page metadata and "button clicks," and that it uses the resulting data to personalize the advertising TikTok serves to individual users.[10]

---

tracking/ (last visited Sept. 28, 2026) ("Standard events are predefined visitor actions that correspond to common, conversion-related activities").

[9] *About TikTok Pixel*, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Aug. 13, 2026).

[10] *Id.* (recommending events that reflect "a full customer journey" from product detail page to cart addition to purchase, and listing "Metadata & Button Clicks" among the categories the Pixel collects); *TikTok Pixel Release Notes*, https://ads.tiktok.com/help/article/pixel-release-notes (last visited Aug. 13, 2026) (stating that landing-page metadata and button-click data may also be used to personalize ad campaigns for people on TikTok).

64. Once user data is received by TikTok's servers through the Pixel, TikTok incorporates that data into its own advertising ecosystem and uses it for its own independent commercial purposes, including audience building, retargeting, conversion measurement and attribution, and the profiling of users across the properties in which the TikTok Pixel is deployed.

65. TikTok's "Advanced Matching" feature is designed to receive the user's email address and telephone number in order to match captured events to identified TikTok accounts.[11]

66. Five Below has deployed the TikTok Pixel in its Apps. Network traffic captured from a user's interaction with the Five Below iOS application shows the Apps transmitting to https://analytics.tiktok.com/api/v2/pixel/act, among other data:

a. a pixel code of "C3SQL5KVE57P75FJ1DD0," which is Five Below's unique TikTok Pixel identifier and attributes the transmitted data to Five Below as the advertiser;
b. a library identifier of "pixel.js" version "2.2.1," confirming that the transmission originates from the TikTok Pixel deployed by Five Below;
c. an "anonymous_id" of "01KXM60H4TKQAWKG4ZCZG1DV8F_.tt.1," a persistent unique identifier that enables TikTok to link every event transmitted from the user's device to a single individual across sessions;
d. a "page" object carrying the URL of the page the user is viewing, together with an origin and referer of https://www.fivebelow.com, confirming that the Pixel is firing from within the Apps;
e. a "session_id," a "pageview_id," a "csid," and a "page_csid," which allow TikTok to group the transmitted events into discrete sessions and page views and to sequence them into a continuous record of the user's visit;
f. an "action" of "Click" together with an "auto_collected_properties" object identifying the element the user tapped—including its HTML tag ("BUTTON"), its class attributes, its position in the page's document object model (an "xpath" of "/HTML/body[1]/div[2]/div[2]/div[1]/div[1]/div[1]/div[5]/button[1]"), the screen coordinates of the tap ("x": 152, "y": 565), and—most significantly—the literal on-screen text of the element in an "inner_text" field, which in the captured transmission reads "Add to Cart";
g. a "device" object identifying the platform as "ios," and a user agent string identifying the Five Below mobile application as the originating application ("is_5b_mobile_app"); and

[11] *TikTok Pixel Release Notes*, *supra* (describing Advanced Matching as a means of sending customer information to better match website events to people on TikTok and describing matching via IP address and user-agent signals).

h. a "signal_diagnostic_labels" object enumerating fields designated "raw_email," "raw_auto_email," "raw_phone," "raw_auto_phone," "hashed_email," "hashed_phone," "raw_eb_email," "raw_eb_phone," and "hashed_eb_email"—fields through which the payload schema is built to carry the user's email address and telephone number, in both raw and hashed form, to TikTok.

67. The "inner_text" field is decisive. TikTok is not merely told that a user was present on a page; TikTok is told, in the user's own on-screen words, which control the user pressed.

68. When a user taps "Add to Cart" on a product listing, the Apps report to TikTok that the user added that item to a cart, together with the coordinates of the tap. This transmission occurs in real time and without any intervening notice to the user.


```
POST https://analytics.tiktok.com/api/v2/pixel/act HTTP/2.0
accept: */*
content-type: text/plain;charset=UTF-8
sec-fetch-site: cross-site
origin: https://www.fivebelow.com
content-length: 2313
sec-fetch-mode: no-cors
user-agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_7 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Mobile/15E148 is_5b_mobile_app HideHeader ios:1
referer: https://www.fivebelow.com/
sec-fetch-dest: empty
cache-control: max-age=0
accept-language: en-US,en;q=0.9
priority: u=7, i
accept-encoding: identity
JavaScript                                   Copy  Edit  Replace  View: javascript
{
 "event_id":"","message_id":"messageId-1784241126635-2473451846026","is_onsite":false,"timestamp":"2026-07-16T22
   "ad": {
     "sdk_env":"external","jsb_status":2
 , }
 ,"action":"Click","auto_collected_properties": {
   "page_trigger":"Click","trigger_element": {
     "tag":"BUTTON","attributes": {
       "class":"py-12 px-24 rounded-[120px]relativetext-14 leading-4 <#SEXUAL_ORIENTATION#>itionoverflow-hidden
     }
     ,"inner_text":"Add to Cart","xpath":"/HTML/body[1]/div[2]/div[2]/div[1]/div[1]/div[1]/div[5]/button[1]","nu
       "x":152,"y":565
     }

   }

 }

}
```

69. Five Below has additionally configured the TikTok Pixel to transmit TikTok Standard Events corresponding to the remaining stages of the purchase funnel, including "ViewContent," "AddToCart," "InitiateCheckout," "AddPaymentInfo," and "CompletePayment," the last of which carries the value and currency of the completed transaction.

70. This configuration enables TikTok to construct a chronological record of the user's shopping and browsing activity in the Apps—arrival, page views, individual taps, cart additions, and completed purchases—and to tie that record to the user's TikTok identity and to the advertising TikTok serves that user.

71. TikTok uses the data it receives from the Apps for its own independent commercial purposes, including to associate the user's activity on the Apps with the user's TikTok identity, to power TikTok's App Activity Custom Audiences and App Event Optimization products, and to refine the user's behavioral profile on TikTok's platform. None of these uses is disclosed in Five Below's Privacy Policy.

***iii. The LogRocket Session Replay Tool.***

72. LogRocket, Inc. is a software company headquartered in Boston, Massachusetts, that markets a "session replay" product to website and mobile-application operators. Session replay software records a user's interactions with a website or application as they occur, transmits the recording to the software vendor's servers, and reconstructs it into a video-like playback that the operator and the vendor can watch after the fact.[12] LogRocket describes its product as

[12] *See Session Replay,* https://lp.logrocket.com/session-replay (last visited Sept. 29, 2026); *LogRocket, AI Session Replay That Catches Issues Before Your Users Do,* https://logrocket.com/ (last visited Sept. 29, 2026*); Configure iOS SDK, LogRocket Docs,* https://docs.logrocket.com/reference/configure-ios-sdk (last visited Sept. 29, 2026).

delivering a "pixel-perfect replay" of every user session, so that its customers can "[s]ee exactly what users experienced" in an app and "[c]apture every event and activity automatically."[13]

73. LogRocket is deployed in one of two ways. On web properties, including web pages rendered inside a mobile application, the operator loads LogRocket's JavaScript recording script ("LogRocket.min.js") into its pages. In native mobile applications, the operator compiles LogRocket's software development kit directly into the application's source code.[14] In either case, the recording code executes on the user's own device and runs silently in the background.

74. Once loaded, LogRocket's code, in LogRocket's own words, "works by intercepting actions in your website/app, such as network requests, touch actions, and Redux events, and sending them to a remote server." It records users' sessions by capturing the content of the page and every change made to it—and, apart from password fields, "all other elements are captured by default," such as click locations and the text a user types into input fields.[15]

75. LogRocket's code transmits the events it captures on the user's device to LogRocket's servers.[16] The transmission is continuous and contemporaneous with the user's

---

[13] *Session Replay*, https://logrocket.com/products/session-replay (last visited Sept. 29, 2026).
[14] *See Quickstart*, https://docs.logrocket.com/docs/quickstart (last visited Sept. 29, 2026); *LogRocket Docs,* https://docs.logrocket.com/reference/ios (last visited Sept. 29, 2026) ("The LogRocket iOS SDK must be initialized from your app delegate's application handler."); *Introduction to LogRocket Mobile, LogRocket Docs,* https://docs.logrocket.com/docs/introduction-to-logrocket-mobile (last visited Sept. 29, 2026) (describing deployment of LogRocket's SDKs for iOS, Android, React Native, and Flutter applications).
[15] *Sanitize DOM Data*, https://docs.logrocket.com/reference/dom (last visited Sept. 29, 2026).
[16] *Performance,* https://docs.logrocket.com/docs/performance (last visited Sept. 29, 2026) ("LogRocket sends an encoded version of the DOM over the network."); *Proxy Traffic Through Your Own Domain,* https://docs.logrocket.com/docs/proxying-traffic-through-your-own-domain (last visited Sept. 29, 2026) (describing "POST requests to the LogRocket data ingestion API" that "are of the form https://r.logrocket.com/*").

activity: the user's taps and entries are acquired by LogRocket as the user makes them, not afterward.

76. In its native mobile deployment, LogRocket's software development kit by default "will capture views automatically": it periodically scans the images, text, buttons, and input elements displayed on the user's screen and transmits the result to LogRocket, which reconstructs the user's session from those captures, together with each touch the user makes and each screen to which the user navigates. Even where LogRocket's redaction features are applied to particular elements, LogRocket confirms that "[m]ovement and clicks over redacted elements will be captured," and that the layout and structure of every screen is preserved, with redacted text replaced by "black bars where the text would have appeared."[17]

77. Whether and to what extent any on-screen content is masked is determined not by the user but by LogRocket's customer—here, Five Below—which selects which elements to capture, redact, or exclude through code it places in its own application.[18] The user is never told that the recording is occurring and is given no means of preventing it.

78. Five Below has embedded LogRocket's session replay software within the Apps. Network traffic captured from a user's interaction with the Five Below iOS application shows the Apps transmitting to LogRocket's data-collection server at r.lgrckt-in.com, among other data: (a) Five Below's unique LogRocket application identifier, "five-below-production"; (b) a persistent

[17] *Sanitize View Data,* https://docs.logrocket.com/reference/ios-redact-view (last visited Sept. 29, 2026) ("By default, the SDK will capture views automatically."); *Automatically Sanitize Text,* https://docs.logrocket.com/reference/ios-automatically-sanitize-text (last visited Sept. 29, 2026) ("Movement and clicks over redacted elements will be captured, but not the selector or text in the redacted element.").

[18] *Sanitize View Data, supra n. 17; Privacy*, https://docs.logrocket.com/docs/privacy (last visited Sept. 29, 2026) ("We designed our SDK to allow developers to determine what information to hide from LogRocket reports.").

LogRocket user identifier assigned to Plaintiff's device and a unique recording identifier for the session; (c) serialized page markup, screen/URL identifiers, tap coordinates, element text, input


```
POST https://r.lgrckt-in.com/i?a=65xtuw%2Ffive-below-production&r=6-019f6cef-f430-7373-8e91-ef44d6915ba2&t=0ef9a1e5-bfd0-4a15-b4d6-28617df5a5a9&s=0&hr=t&u=96ff9436-62b6-4ff5-b9ae-a7af7cdda113&is=ANONYMOUS&rs=0%2Ct&ct=11.7798278862556 HTTP/2.0
accept: */*
content-type: application/octet-stream
sec-fetch-site: cross-site
origin: https://www.fivebelow.com
x-logrocket-relay-version: 2025.8.0
sec-fetch-mode: cors
user-agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_7 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Mobile/15E148 is_5b_mobile_app HideHeader ios:1
referer: https://www.fivebelow.com/
sec-fetch-dest: empty
content-length: 5659
accept-language: en-US,en;q=0.9
priority: u=3, i
accept-encoding: identity
Raw    Copy  Edit  Replace  View: auto
\xc4.   .0+\xd2\xcf\xf6yB..lr.network.RequestEvent.\x8d.
.fetch-26.8https://ingesteer.services-prod.nsvcs.net/rum_collection.\xac.
Authorization.\x9a.Bearer eyJhbGciOiJIUzI1NiIsInR5cCI6IkpXVCJ9.eyJzaXRlX2lkIjoiNmIwZGFiZmYtODg4ZS00ODQ4LTk5YzItOGYwYj
.Content-Type..application/json"\xeb..\xe8.["{\"site_id\":\"\",\"branch\":\"\",\"context\":\"\",\"timestamp_ms\":1784
x       .\x90*\xd2\xcf\xf6yB..lr.network.RequestEvent.B
.resource-182.&https://www.fivebelow.com/cdn-cgi/rum?"...[{}](.H. .(\xc6!P.Y....\xf2\*A`.
\xd3.   .@,\xd2\xcf\xf6yB..lr.network.ResponseEvent.\x9b.
.resource-182.\xc8."...[{"transferSize":1},300]*&https://www.fivebelow.com/cdn-cgi/rum?`.i......;@\x82.5https://www.f
\xb2.   .\xf0*\xd2\xcf\xf6yB..lr.network.RequestEvent.\xfb.
.resource-183.\xde.https://bam.nr-data.net/events/1/NRJS-87016a651f8751ab0a2?a=601421237&sa=1&v=1.290.0&t=Unnamed%20T
\x8a.   .\xb0,\xd2\xcf\xf6yB..lr.network.ResponseEvent.\xd2.
.resource-183.\xc8."...[{"transferSize":1},0]*\xde.https://bam.nr-data.net/events/1/NRJS-87016a651f8751ab0a2?a=601421
\xb4.   .\xf0*\xd2\xcf\xf6yB..lr.network.RequestEvent.\xfd.
```


change events; (d) a user agent identifying the request as originating from within the Five Below iOS application; and (e) records of the network requests the Apps themselves made to Five Below's servers and to other third parties while Plaintiff used them, including the authorization credentials transmitted with those requests. A representative capture of that transmission appears below:

79. From the moment a user opens the Apps, and throughout every subsequent session, the LogRocket software records the user's activity within the Apps—every screen and product listing the user views, every search the user runs, every tap, swipe, and scroll the user makes, the sequence and timing of those actions, and the user's progress through the cart and checkout flow—and transmits that recording, in real time, to LogRocket's servers.

80. The result is a complete, replayable record of the user's visit—functionally, a video of the user's entire shopping session—that Five Below personnel and LogRocket can search, filter, and watch at will, and that is linked to the individual user through the account, device, and session identifiers transmitted alongside it.

81. In short, the LogRocket session replay software captures essentially everything a user does in the Apps: every screen the user opens, every product listing the user views, every search the user runs, every button and control the user taps, every swipe and scroll, every item the user adds to or removes from a cart, every field the user completes at registration and checkout, and the order, timing, and duration of each of those actions. There is no category of in-app activity that the software is configured to ignore, and no portion of a user's session that it does not record.

82. LogRocket does not receive these recordings as a passive conduit. LogRocket acquires the contents of users' communications with Five Below on its own servers, stores them, indexes them so that they can be searched, and processes them through its own analytics products. LogRocket also uses data derived from the sessions it records to develop, train, and improve its own products and services.

83. Session replay recording differs in kind from the event-level tracking performed by the Facebook and TikTok Pixels. Whereas the Pixels report discrete events—a page view, a tap, a cart addition, a purchase—session replay captures the user's entire interaction with the Apps,

continuously and in full, including the hesitation, backtracking, abandoned searches, and abandoned carts that the user never chose to share with anyone. It is the digital equivalent of a stranger standing over the user's shoulder, watching and recording everything the user does, for the entire time the user is in the store.

84. At no point does Five Below disclose to users of the Apps that their sessions are being recorded. No banner, prompt, notice, or setting within the Apps informs the user that a session replay tool is active, identifies LogRocket, or offers the user the opportunity to decline recording.

85. Plaintiff and Class members therefore never consented to the recording of their sessions in the Apps by LogRocket or to the transmission of those recordings to LogRocket.

### *C. Five Below Allows Sensitive Information to Be Intercepted in Its App.*

86. The data that Five Below intercepts and transmits through the Tracking Technologies is among the most sensitive data a consumer household maintains.

87. The specific combination of fields captured by the Tracking Technologies—persistent identifier, full URL or screen identifier of the product listing, title of the product listing including product name, category, and price, engagement depth, cart activity, and purchase events including transaction value—constitutes a comprehensive record of a user's shopping activity.

88. That record discloses, at a minimum: (a) the specific products and product categories the user browses; (b) the items the user adds to a cart and the items the user actually purchases; (c) the prices the user is willing to pay and the total amounts the user spends; (d) the user's household composition, life events, health and personal-care needs, and religious observance (inferable from the merchandise viewed and purchased); (e) the user's geographic

location; and (f) the user's level of active interest in each item (inferable from scroll depth, cart activity, and purchase activity).

89. Retail purchase information is widely recognized as sensitive. What a consumer buys routinely discloses that consumer's health conditions, family circumstances, religious practice, and financial condition.[19]

90. Disclosure of a user's shopping and purchase activity to a data broker or advertising platform creates a durable record of that activity that can be sold, combined with other data sources, and used for purposes ranging from targeted advertising to behavioral price discrimination to the inference of household composition, financial distress, pregnancy, or health conditions associated with particular categories of merchandise.

91. Moreover, the disclosure of Sensitive Information to advertising platforms like Meta and TikTok creates a known risk of predatory and discriminatory ad targeting and of differential pricing. Retail purchase and browsing signals are among the most valuable inputs to these platforms' profiling systems precisely because they reveal what a consumer needs, what a consumer can afford, and what a consumer can be induced to buy.

92. Every additional data point that a platform like Meta receives about a user's shopping and purchase activity increases the scope and precision of Meta's ability to profile that

[19] *See* Fed. Trade Comm'n, *Data Brokers: A Call for Transparency and Accountability* (May 2014), https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-recommends-congress-require-data-broker-industry-be-more-transparent-give-consumers-greater (last visited Sept. 28, 2026) (encouraging Congress to consider legislation "requiring retailers and other consumer-facing entities to obtain affirmative express consent from consumers before such information is collected and shared.).

user's household, to infer that user's sensitive characteristics, and to target that user with advertising calibrated to those inferences.[20]

93. Five Below has never placed before its App users any disclosure that the Apps transmit the contents of their communications with Five Below—the search terms they enter, the specific product listings they request, the items they place in their carts, and the amounts they pay—to Meta, TikTok, or LogRocket.

94. It makes no such disclosure anywhere within the Apps; it makes none when a user downloads the Apps, registers for an account, or checks out; and it presents users with no document in which such a disclosure could be found.

95. Whereas reasonable users would expect communications made in the Apps to remain private, and whereas Five Below has failed to notify users of third-party advertisers poised to intercept their Sensitive Information, Five Below has allowed Meta, TikTok, and other third parties to intercept in real time every product-listing view and every search, cart addition, and purchase in the Apps, together with a persistent identifier that links that activity to the individual user.

96. Once received, Meta, TikTok, and LogRocket do not merely store the intercepted data on Five Below's behalf or use it solely to provide services to Five Below.

---

[20] *See United States v. Meta Platforms, Inc.*, 2023 WL 8438579 (S.D.N.Y. June 21, 2022) (consent decree resolving Fair Housing Act claims arising from Meta's targeted-advertising system, under which Meta agreed to develop a Variance Reduction System and to extend that system from housing to employment and credit advertisements, and paid the maximum civil penalty of $115,054 available under the FHA); *see also* Muhammad Ali, Piotr Sapiezynski, Miranda Bogen, Aleksandra Korolova, Alan Mislove & Aaron Rieke*, Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead to Biased Outcomes*, 3 Proc. ACM Hum.-Comput. Interact. art. 199 (CSCW 2019), available at https://dl.acm.org/doi/10.1145/3359301 (last visited August 25, 2026) (documenting significant skew in Facebook's delivery of advertisements along gender and racial lines despite neutral targeting parameters).

97. Rather, Meta, TikTok, and LogRocket use the data intercepted from Five Below's Apps for their own independent commercial purposes, combining it with data collected from across the millions of other websites and applications that have integrated the Facebook Pixel and SDK and the TikTok Pixel to build and refine comprehensive, cross-platform user profiles that are then made available to third-party advertisers.

98. Users of the Apps never contemplated, consented to, or were informed that their Sensitive Information would be used by Meta, TikTok, and LogRocket for these independent commercial purposes—purposes wholly unrelated to the retail services Five Below provides.

99. Five Below did not obtain the requisite consent to the interception and transmission of their Sensitive Information to Meta, TikTok, or LogRocket.

***D. Representative Plaintiff's Experience***

100. Plaintiff Tamara Rubio currently resides (and at all times relevant hereto has resided) in Downey, Los Angeles County, California.

101. In or around 2024, while living and physically present in Downey, California, Plaintiff downloaded the Five Below mobile application to her personal device, and used the Apps to browse, search for, and purchase merchandise, including items she purchased for her minor child. Plaintiff used the Apps on a recurring basis through July 2026.

102. During her use of the Apps, Plaintiff provided to Five Below personally identifying information including her name, email address, telephone number, geographic location, shipping address, and payment card and billing information.

103. Plaintiff also browsed, viewed, saved, added to her cart, and purchased specific products through the Apps, including listings that disclosed the specific merchandise Plaintiff was considering and the prices Plaintiff was willing to pay.

104. Throughout Plaintiff's use of the Apps, the Facebook Pixel and Facebook SDK, the TikTok Pixel, and the LogRocket session replay software embedded within the Apps secretly intercepted Plaintiff's private communications with Five Below—including the specific URLs and titles of the pages and product listings Plaintiff viewed; the searches Plaintiff ran; the buttons and controls Plaintiff tapped, including "Add to Cart"; the items Plaintiff added to her cart; the purchases Plaintiff completed and the amounts Plaintiff paid; Plaintiff's persistent Facebook and TikTok identifiers; Plaintiff's IP address; and Plaintiff's device and application information, and personally identifying information including her name, email address, telephone number, geographic location, and shipping address—and transmitted that information to Meta, TikTok, and/or LogRocket without Plaintiff's knowledge or consent.

105. Throughout the same period, the LogRocket session replay software embedded within the Apps recorded Plaintiff's every screen view, search, tap, swipe, scroll, and entry within the Apps—including her browsing of specific product listings, her cart activity, and her progress through checkout; in short, essentially everything Plaintiff did in the Apps—and transmitted those recordings, as they were made, to LogRocket's servers, where they could be searched and replayed by Five Below and LogRocket. Plaintiff was never told that her sessions were being recorded and never agreed to be recorded.

106. At no point before, during, or after using the Apps did Plaintiff consent to Plaintiff's Sensitive Information, personal data, or device identifiers being intercepted and transmitted to Meta, TikTok, or LogRocket as described herein.

107. When Plaintiff completed her purchases at checkout, Plaintiff did not assent to any Terms of Use or Privacy Policy.

108. Plaintiff was unaware at the time that her information was being captured in real time by the Facebook Pixel and Facebook SDK, the TikTok Pixel, and the LogRocket session replay software embedded within the App and disclosed to Meta, TikTok, and other third parties, which combine user data from across the web and mobile applications to create personalized, identifiable advertising profiles.

109. Had Plaintiff known that Five Below was using the Facebook Pixel and Facebook SDK, the TikTok Pixel, and the LogRocket session replay software to capture Plaintiff's Sensitive Information, and that Meta, TikTok, and other third parties combine this data with users' broader digital activity to build personalized advertising profiles, Plaintiff would not have used the Apps, would have limited the information Plaintiff provided and the extent of Plaintiff's engagement, or would not have used the App on the terms offered.

110. As a direct and proximate result of Five Below's conduct, Plaintiff's privacy rights were violated, and Plaintiff suffered harm in the form of: the unauthorized disclosure of Plaintiff's Sensitive Information to third-party advertising companies; the receipt of unwanted targeted advertisements across Plaintiff's social media and other platforms related to Plaintiff's use of the App; loss of control over Plaintiff's private personal data and Sensitive Information; loss of the benefit of the bargain in keeping or exchanging Plaintiff's private data; and other harms related to the undisclosed and non-consensual interception and transmission of Plaintiff's Sensitive Information.

***E. Tolling***

111. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her Sensitive Information was intercepted and unlawfully disclosed to Meta, TikTok, and LogRocket because Defendant kept

this information secret. Plaintiff only became aware of the disclosure of her information through her attorneys' investigation in June 2026. Alternatively, applicable statutes of limitations have been tolled by other applicable rules or doctrines, including Pennsylvania's discovery rule and the doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

112. Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

113. Plaintiff seeks to represent the following classes (together, the "Classes," and each, a "Class"):

**Nationwide Class:**

All persons in the United States who used the Apps during the applicable statutory period and whose data was intercepted and transmitted to third parties by the Tracking Technologies embedded in the Apps (the "Nationwide Class").

**California Subclass:**

All persons in the State of California who used the Apps during the applicable statutory period and whose data was intercepted and transmitted to third parties by the Tracking Technologies embedded in the Apps (the "California Subclass").

**Purchaser Subclass:**

All persons in the California Subclass who made a purchase on the Apps (the "Purchaser Subclass").

114. Excluded from the Classes are Defendant, its officers, directors, employees, parents, subsidiaries, affiliates, and legal representatives; any entity in which Defendant has a controlling interest; the judge(s) presiding over this action and their immediate family members and staff; and all persons who have already received or are entitled to receive compensation for the same claims asserted herein.

115. **Numerosity:** The exact number of members of the Classes is unknown but, upon information and good faith belief, is estimated to number in the hundreds of thousands, and

individual joinder of these claims is therefore wholly impracticable. Members of the Classes can be readily identified through Defendant's records and objective criteria, and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

116. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's wrongful conduct, misrepresentations, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages as a result of Defendant's uniform illegal conduct.

117. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

118. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Classes and those questions predominate over any questions that may affect individual members of the Classes. Common questions include, but are not limited to:

a. Whether Defendant embedded the Facebook Pixel and Facebook SDK, the TikTok Pixel, and the LogRocket session replay software within the Apps;
b. Whether those Tracking Technologies intercepted, recorded, and transmitted Sensitive Information to Meta, TikTok, LogRocket, and other third parties;
c. Whether Defendant disclosed those transmissions to users or obtained users' consent;
d. Whether the terms Defendant purports to present to users on the App download screen and at checkout are enforceable, given that the interface elements by which a user would review and accept them do not function;
e. Whether Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511, 2520;
f. Whether Defendant violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. §§ 5701, et seq.;
g. Whether Defendant violated the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632;

h. Whether Defendant's conduct constitutes an unlawful, unfair, or fraudulent business act or practice under the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.;
i. Whether Defendant's conduct constitutes intrusion upon seclusion; and
j. Whether Defendant was unjustly enriched by intercepting and monetizing users' Sensitive Information.

119. **Superiority:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that class-wide adjudication will provide a realistic means for members of the Classes to receive monetary relief; the monetary relief suffered by individual members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have equitable recourse for the conduct alleged herein; and issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiff and counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

120. **Ascertainability:** Members of the Classes are readily ascertainable through Defendant's own records, which include user account information (including names, email addresses, shipping addresses, and order histories) and server logs reflecting users' interactions with the Apps.

## CAUSES OF ACTION

## COUNT I

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**

**18 U.S.C. §§ 2511, 2520**

***(On Behalf of Plaintiff & the Nationwide Class)***

121. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

122. The Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)(a), prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication.

123. Plaintiff's and Class members' interactions with the Apps—including the URLs and screen identifiers of the product listings they viewed, the titles and prices of those listings, the searches they ran, the items they added to their carts, the purchases they completed, and the engagement data associated with those interactions—constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12) because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system.

124. Defendant intentionally embedded the Facebook Pixel and Facebook SDK, the TikTok Pixel, and the LogRocket session replay software within the Apps, which intercepted Plaintiff's and Class members' electronic communications and transmitted the contents of those communications—including the full URLs, titles, and contents of the product listings viewed, the searches run, the cart additions made, and the purchases completed—to Meta, TikTok, and other third parties in real time, simultaneously with the transmission of those communications between users and Defendant, and without the knowledge or consent of Plaintiff or the Class members.

125. While 18 U.S.C. § 2511(2)(d) provides an exception permitting a party to a communication to intercept that communication, this exception expressly does not apply where the communication is intercepted "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

126. Defendant's interception of Plaintiff's and Class members' electronic communications was undertaken for the purpose of committing the tortious act of invasion of privacy (intrusion upon seclusion), as alleged herein.

127. Specifically, Defendant secretly, and without disclosure in its Privacy Policy or anywhere else, embedded the Tracking Technologies within the Apps to intercept users' Sensitive Information—including the specific products users were browsing, the prices users were willing to pay, and the purchases users completed—and to transmit that data to Meta, TikTok, and other third parties for advertising, analytics, and profiling purposes, without users' knowledge or consent.

128. In any event, Meta, TikTok, and LogRocket, in receiving the intercepted communications, act not as mere conduits for Defendant but as independent third-party interceptors for their own commercial purposes.

129. Defendant's conduct was willful and intentional. Defendant deliberately implemented the Tracking Technologies knowing they would intercept users' electronic communications and transmit them to third parties without proper consent. Defendant cannot establish consent, because the only terms it purports to present to users of the Apps cannot be reviewed or accepted, as set forth in Section D above.

130. As a direct and proximate result of Defendant's violations of 18 U.S.C. § 2511, Plaintiff and the Class members have been injured and are entitled to relief pursuant to 18 U.S.C. § 2520, including: (a) statutory damages of the greater of $100 per day of violation or $10,000 for each Class member; (b) punitive damages in appropriate cases; (c) a reasonable attorney's fee and litigation costs reasonably incurred; and (d) such preliminary and equitable or declaratory relief as appropriate.

**COUNT II**
**VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT**
**18 Pa. C.S. §§ 5701, et seq.**
***(On Behalf of Plaintiff & the Nationwide Class)***

131. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

132. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class.

133. The Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. §§ 5701, et seq., makes it unlawful for any person to:

> (1) intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept any wire, electronic or oral communication;
> (2) intentionally disclose[] or endeavor[] to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or
> (3) intentionally use[] or endeavor[] to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication.

18 Pa. C.S. § 5703.

134. WESCA provides a private right of action to "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter" against "any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication." 18 Pa. C.S. § 5725(a).

135. WESCA defines "intercept" as the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device," and defines "contents" as "any information concerning the substance, purport, or meaning

of that communication." 18 Pa. C.S. § 5702. It defines an "electronic communication" as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." *Id.*

136. Unlike its federal counterpart, WESCA is an all-party consent statute. It excepts an interception from liability only "where all parties to the communication have given prior consent to such interception," 18 Pa. C.S. § 5704(4), and it contains no exception permitting a party to a communication, or a person acting at a party's direction, to intercept that communication without the prior consent of every other party. *See Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121 (3d Cir. 2022).

137. Plaintiff's and Class members' interactions with the Apps—including the requests that identified the product listings they viewed, the search queries they entered, the controls they tapped, the items they added to their carts, the purchases they completed, and the text they entered into the Apps—are "electronic communications" within the meaning of WESCA, and the substance of those interactions constitutes the "contents" of those communications.

138. The Tracking Technologies are "electronic, mechanical or other device[s]" within the meaning of WESCA. Each is a software tool designed for a single purpose: to acquire the contents of a user's communications with Five Below and to transmit those contents to a third party.

139. Defendant intentionally intercepted, endeavored to intercept, and procured Meta, TikTok, and LogRocket to intercept Plaintiff's and Class members' electronic communications by embedding the Tracking Technologies within the Apps and configuring them to acquire the contents of those communications contemporaneously with their transmission and to route those contents to Meta, TikTok, and LogRocket.

140. Meta, TikTok, and LogRocket in turn acquired the contents of those communications as they were being made—the Facebook and TikTok Pixels acquiring, among other things, the URLs and titles of the product listings users viewed and the literal on-screen text of the controls users tapped, and the LogRocket software acquiring a continuous recording of essentially everything users did in the Apps—every screen view, tap, swipe, scroll, and entry—and used those contents for their own purposes, as alleged above.

141. Defendant also intentionally disclosed, and intentionally used, the contents of those communications knowing that they had been obtained through interception: it disclosed them to Meta, TikTok, and LogRocket by configuring the Tracking Technologies to route them to those companies, and it used them—and the audiences, analytics, session recordings, and other evidence derived from them—to target advertising, to analyze user behavior, and to further its own commercial interests.

142. Defendant's violations of WESCA occurred in, and emanated from, the Commonwealth of Pennsylvania. Defendant is a Pennsylvania corporation headquartered in Philadelphia. On information and belief, Defendant designed, developed, and maintains the Apps from its Philadelphia headquarters; made the decisions to embed the Tracking Technologies within the Apps and to configure them as alleged herein at its Philadelphia headquarters; entered into its agreements with Meta, TikTok, and LogRocket, and thereby procured their interception of users' communications, from Pennsylvania; and received, reviewed, and used the intercepted contents—including LogRocket session recordings and Meta and TikTok audience and analytics data—in Pennsylvania.

143. Neither Plaintiff nor any Class member gave prior consent to the interception of their communications by Defendant, Meta, TikTok, or LogRocket. Specifically:

a. Defendant never sought or obtained consent from Plaintiff or Class members before the Tracking Technologies began intercepting their communications;
b. The Tracking Technologies begin acquiring and transmitting the contents of users' communications from the moment a user opens the Apps, before the user has had any opportunity to learn of, let alone consent to, the interception;
c. Defendant never provided clear, conspicuous notice—within the Apps or otherwise—that users' communications would be intercepted, recorded, or shared with Meta, TikTok, LogRocket, or any other third party;
d. The Privacy Policy in which Defendant purports to describe its data practices was never presented to users of the version of the Apps that Plaintiff used, could not be opened from within the Apps, and in any event does not disclose the presence of the Facebook Pixel, the Facebook SDK, the TikTok Pixel, or the LogRocket session replay software, does not identify Meta, TikTok, or LogRocket by name, and does not disclose that users' communications are intercepted and their sessions recorded; and
e. The terms Defendant purports to present to users on the App download screen and at checkout cannot be reviewed or accepted—the hyperlinks and acceptance elements do not function—and therefore no user could manifest assent to them.

144. Consent under WESCA must be given by all parties and must precede the interception. Consent cannot be implied from a document that a user was never shown and could not open, and it cannot be implied from a user's continued use of an application whose recording and interception features were concealed from the user.

145. Defendant's conduct was intentional. Defendant deliberately embedded the Tracking Technologies within the Apps, deliberately configured them to acquire and transmit the contents of users' communications, and deliberately withheld any disclosure of that conduct from the download, registration, and checkout flows through which every user must pass.

146. As a direct and proximate result of Defendant's violations of WESCA, Plaintiff and Class members have been injured, including through the invasion of their privacy, the loss of confidentiality of their communications, and the loss of control over their Sensitive Information.

147. Pursuant to 18 Pa. C.S. § 5725(a), Plaintiff and Class members are entitled to recover from Defendant: (a) actual damages, but not less than liquidated damages computed at the

rate of $100 per day for each day of violation, or $1,000, whichever is higher; (b) punitive damages; and (c) a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT III**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
***(On Behalf of Plaintiff & the California Subclass)***

148. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

149. Plaintiff brings this claim individually and on behalf of the members of the California Subclass.

150. California Penal Code § 631(a) establishes liability for any person who:

> [I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
> or
> [W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state,
> or
> [U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
> or
> [A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

151. At all relevant times, Plaintiff and California Subclass members were accessing and using the Apps to browse, search for, and purchase merchandise. Plaintiff's and California Subclass members' interactions with the Apps constitute communications in transit over a wire, line, cable, or instrument within the meaning of Cal. Penal Code § 631(a).

152. The Tracking Technologies embedded within the Apps constitute unauthorized connections to a wire, line, cable, or instrument and are devices capable of intercepting communications within the meaning of Cal. Penal Code § 631, as they are specifically designed to capture, copy, and transmit user communications as they occur and while they are in transit between the user's device and Defendant's servers.

153. Defendant aided, agreed with, employed, and conspired with Meta, TikTok, and other third parties to intercept Plaintiff's and California Subclass members' communications by embedding the Facebook Pixel and Facebook SDK, the TikTok Pixel, and the LogRocket session replay software within the Apps, and by configuring those Tracking Technologies to transmit users' Sensitive Information to Meta, TikTok, and other third parties for these parties' own use.

154. Meta, TikTok, and LogRocket, in turn, willfully and without the consent of all parties to the communications read or learned, or attempted to read or learn, the contents of Plaintiff's and California Subclass members' communications with Defendant while those communications were in transit and used the information so obtained for their own independent commercial purposes, including advertising, audience building, and cross-platform profiling.

155. Defendant's interception, and its procurement of Meta's, TikTok's, and LogRocket's interception, was accomplished without the consent of Plaintiff or the California Subclass members. Specifically:

a. Defendant never obtained express consent from Plaintiff or California Subclass members before implementing the Tracking Technologies;
b. The Tracking Technologies begin transmitting user data to Meta, TikTok, and LogRocket from the moment a user opens the Apps, before the user has had any opportunity to review the Privacy Policy or to provide informed consent;
c. Defendant never provided clear, conspicuous notice that users' Sensitive Information would be intercepted and shared with Meta, TikTok, or LogRocket;
d. Defendant's Privacy Policy does not disclose the presence of the Facebook Pixel, the Facebook SDK, the TikTok Pixel, or the LogRocket session replay software within the

Apps, does not identify Meta, TikTok, or LogRocket by name, and describes third-party sharing only in categorical terms;

e. Any purported consent was ineffective because the interception began before consent could be obtained and because Defendant's disclosures were inadequate and materially misleading; and

f. Any purported consent was in any event ineffective because the terms Defendant displays cannot be reviewed or accepted.

156. The intercepted communications include highly Sensitive Information—the specific products users are browsing, the prices users are willing to pay, the searches users run, the items users add to their carts, and the purchases users complete—that Plaintiff and California Subclass members provided with reasonable expectations of privacy and confidentiality.

157. Defendant's conduct was willful and intentional, as Defendant deliberately implemented the Tracking Technologies knowing they would intercept users' electronic communications and transmit them to Meta, TikTok, and LogRocket without proper consent.

158. As a direct and proximate result of Defendant's violations of Cal. Penal Code § 631, Plaintiff and California Subclass members have suffered injury, including invasion of privacy, loss of confidentiality of personal information, loss of control over their Sensitive Information, and violation of their statutory rights.

159. Plaintiff and California Subclass members continue to desire to use the Apps but have a reasonable fear that their communications will continue to be intercepted without consent if they continue to do so.

160. Under Cal. Penal Code § 637.2, Plaintiff and California Subclass members are entitled to:

a. Five thousand dollars ($5,000) per violation;

b. Three times the amount of actual damages sustained by Plaintiff and California Subclass members; and

c. Equitable or declaratory relief, including a preliminary and permanent injunction prohibiting Defendant from continuing its unlawful interception of user communications.

**COUNT IV**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 632**
***(On Behalf of Plaintiff & the California Subclass)***

161. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

162. Plaintiff brings this claim individually and on behalf of the members of the California Subclass.

163. California Penal Code § 632(a) provides that:

> [E]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]

164. California Penal Code § 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

165. The communications between Plaintiff and California Subclass members and Defendant through the Apps constitute "confidential communications" within the meaning of Section 632(c).

166. Plaintiff and California Subclass members had an objectively reasonable expectation of privacy with respect to those communications, and Defendant created and

reinforced that expectation by placing no disclosure of its third-party data-sharing practices before users' communications are recorded.

167. Defendant intentionally used electronic recording devices—specifically, the Facebook Pixel and Facebook SDK, the TikTok Pixel, and the LogRocket session replay software embedded within the Apps—to eavesdrop upon and record these confidential communications.

168. The Tracking Technologies constitute "electronic amplifying or recording device[s]" within the meaning of Section 632(a) because they are specifically designed to capture, record, and transmit user interactions and communications in real time for analytics and behavioral-tracking purposes. The LogRocket session replay software, in particular, is a recording device in the most literal sense: it records essentially everything a user does in the Apps and reproduces it for later playback.

169. Defendant intentionally implemented and activated these recording technologies within the Apps with full knowledge that they would capture and record users' confidential communications.

170. Defendant's recording of Plaintiff's and California Subclass members' confidential communications was accomplished without the consent of all parties to the communication, specifically:

a. Plaintiff and California Subclass members never consented to having their confidential communications recorded by the Tracking Technologies;
b. Defendant never obtained express consent before implementing the recording technologies;
c. Users were not informed that their communications would be recorded and transmitted to Meta, TikTok, or LogRocket;
d. No clear, conspicuous notice was provided regarding the scope and nature of the recording of confidential communications;
e. The recording began immediately upon the user opening the App before users had any opportunity to review the Privacy Policy or to provide informed consent; and
f. Any purported consent was in any event ineffective because the terms Defendant displays on the App cannot be reviewed or accepted.

171. Defendant's conduct was undertaken intentionally and with knowledge that the Tracking Technologies would record confidential communications without proper consent from all parties.

172. The confidential communications that were unlawfully recorded include the specific product listings Plaintiff and California Subclass members viewed, the searches they ran, the items they added to their carts, and the purchases they completed—information that reveals the merchandise Plaintiff and California Subclass members were considering, the prices they were willing to pay, and the amounts they spent.

173. As a direct and proximate result of Defendant's violations of Section 632, Plaintiff and California Subclass members have suffered harm, including invasion of their privacy rights, violation of confidentiality, and loss of control over their Sensitive Information.

174. Unless enjoined and restrained by this Court, Defendant will continue to commit these violations. Plaintiff and California Subclass members have a reasonable fear that their confidential communications will continue to be unlawfully recorded if they continue to use the Apps.

175. Pursuant to California Penal Code § 637.2, Plaintiff and California Subclass members are entitled to:

a. A preliminary and permanent injunction prohibiting Defendant from continuing its unlawful recording of confidential communications;
b. Statutory damages of $5,000 per violation;
c. Three times the amount of actual damages, if any, sustained by Plaintiff and California Subclass members; and
d. Any other relief the Court deems proper.

## COUNT V
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### CAL. BUS. & PROF. CODE §§ 17200, ET SEQ.
***(On Behalf of Plaintiff & the Purchaser Subclass)***

176. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

177. The California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., prohibits any "unlawful, unfair or fraudulent business act or practice."

178. Defendant is a "person" within the meaning of Cal. Bus. & Prof. Code § 17201 and, at all relevant times, engaged in "business acts or practices" within the meaning of § 17200 by marketing and selling merchandise to California consumers through its retail stores, its website at www.fivebelow.com, and its Apps.

179. Defendant's conduct constitutes an unlawful business act or practice. Defendant's interception and transmission of Plaintiff's and Purchaser Subclass members' Sensitive Information violates the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511 and 2520; the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. §§ 5701, et seq.; and the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632, as alleged in Counts I through IV above, each of which independently constitutes a predicate unlawful act under the UCL.

180. Defendant's conduct constitutes an unfair business act or practice. The harm to consumers from the covert interception of their shopping and browsing activity and its transmission to advertising platforms for those platforms' own profiling purposes vastly outweighs any utility of that conduct, and the practice is immoral, unethical, oppressive, and substantially injurious to consumers.

181. Consumers could not reasonably have avoided the injury, because the Tracking Technologies operate invisibly and begin transmitting data before any user has an opportunity to review or accept any terms—and the terms Defendant purports to present to users of the Apps cannot in fact be reviewed or accepted at all.

182. Defendant's conduct constitutes a fraudulent business act or practice. Defendant markets the Apps to the general public as an ordinary retail shopping service and has induced millions of consumers to download the Apps, register for accounts, and transact through them while concealing that the Apps transmit users' Sensitive Information to Meta, TikTok, and LogRocket in real time. Defendant discloses that conduct nowhere within the Apps, and it places before its users no document—operative or otherwise—from which a consumer could learn of it. That concealment is likely to deceive a reasonable consumer.

183. Defendant's concealment of its data-sharing practices, and its operation of the Apps as an ordinary retail shopping service while those practices were in place, are materially misleading.

184. A reasonable consumer acting reasonably under the circumstances—downloading the Apps and registering for an account without being presented with any disclosure of Defendant's data-sharing practices, and unable to open the documents Defendant purported to reference—would understand that:

a. Information a user provides to a retailer in the course of shopping is used by that retailer to provide the shopping service, and is shared, if at all, only with vendors processing that information on the retailer's behalf;
b. User data is not transmitted to the world's largest advertising platforms for those platforms' own advertising and profiling purposes;
c. Defendant takes the steps reasonably necessary to ensure that user data is treated securely; and
d. Sensitive payment, purchase, and location data, in particular, will not be sold, rented, loaned, traded, leased, or otherwise transferred or disclosed to any third party for any purpose other than completing the user's transaction.

185. In truth and in fact, and contrary to these reasonable expectations:

a. Defendant transmits users' Sensitive Information—including the URLs and titles of the specific product listings users view, the prices of those items, users' search queries, users' engagement depth, and users' cart additions and completed purchases—to Meta, TikTok, and other third parties, together with persistent identifiers that link that activity to individual users;
b. Meta, TikTok, and LogRocket use the intercepted data for their own independent commercial purposes, including advertising, audience building, and cross-platform profiling, and not merely to provide services to Defendant;
c. Defendant has not taken all steps reasonably necessary to protect user data; it has, to the contrary, affirmatively deployed tools that cause that data to be exposed to and used by Meta, TikTok, and LogRocket; and
d. Defendant discloses the existence, scope, and operation of these third-party Tracking Technologies nowhere in the Apps; it does not present users with its Privacy Policy when they download the Apps, register for an account, or check out; and that policy, when located independently, describes third-party sharing only in categorical terms, identifies none of Meta, TikTok, or LogRocket by name, and nowhere discloses that the specific pages users view, the controls users tap, or the contents of users' communications are transmitted to those companies.

186. Defendant's omissions and concealment are material because a reasonable consumer would consider the fact that a retailer transmits its customers' Sensitive Information—including the specific merchandise they browse, the prices they are willing to pay, and the purchases they complete—to Meta, TikTok, and other third parties for those third parties' own advertising and profiling purposes to be important to his or her decision to download the Apps.

187. Plaintiff and Purchaser Subclass members have suffered injury in fact and lost money or property because of Defendant's unfair competition within the meaning of Cal. Bus. & Prof. Code § 17204.

188. Plaintiff and Purchaser Subclass members were injured by Defendant's unlawful, unfair, and fraudulent business acts and practices.

189. Plaintiff and Purchaser Subclass members suffered economic injury in the form of the loss of the benefit of the bargain in providing Sensitive Information to Defendant in exchange for the confidential and secure handling a reasonable consumer was entitled to expect.

190. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and Purchaser Subclass members are entitled to: (a) an injunction prohibiting Defendant from continuing the unlawful, unfair, and fraudulent business acts and practices alleged herein, including an order requiring Defendant to remove the Tracking Technologies from the Apps, to disclose its data-sharing practices, and to repair the non-functional terms-acceptance interface in the Apps; (b) restitution and disgorgement of the monies and benefits Defendant obtained by means of its unfair competition; and (c) reasonable attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

191. Defendant's conduct was willful and knowing. Defendant deliberately implemented the Facebook, TikTok, and LogRocket Tracking Technologies within the Apps and configured them to transmit users' Sensitive Information to Meta, TikTok, and LogRocket without users' knowledge or consent.

**COUNT VI**
**INTRUSION UPON SECLUSION**
***(On Behalf of Plaintiff & the Nationwide Class,***
***or Alternatively on Behalf of the California Subclass)***

192. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

193. Under the Restatement (Second) of Torts § 652B, one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or her private affairs or concerns, is subject to liability to the other for invasion of her privacy if the intrusion would be highly offensive to a reasonable person.

194. Plaintiff and Class members had a reasonable expectation of privacy in their interactions with the Apps.

195. The Apps are designed for a personal activity—shopping for household, personal-care, health, family, and other consumer goods—that discloses intimate details of a consumer's

household, finances, and circumstances. Users reasonably expected that their browsing and purchase activity would remain between themselves and Five Below and would not be secretly intercepted and transmitted to third-party advertising companies.

196. Defendant intentionally intruded upon the solitude and seclusion of Plaintiff and Class members by secretly embedding the Facebook Pixel and Facebook SDK, the TikTok Pixel, and the LogRocket session replay software within the Apps, and configuring those Tracking Technologies to intercept users' private Sensitive Information—including the URLs and titles of the product listings users viewed, the prices of the items they considered, the searches they ran, the items they added to their carts, and the purchases they completed—and to transmit that data, alongside persistent unique identifiers, to Meta, TikTok, and other third parties in real time, without users' knowledge or consent.

197. The intrusion was into a matter that Plaintiff and Class members had a right to keep private. The categories of information intercepted—the specific merchandise a user browses and buys, the prices the user is willing to pay, the amounts the user spends, and the user's detailed engagement with each listing—constitute information whose disclosure can result in material economic and reputational harm, including the exposure of health conditions, family circumstances, religious practice, and financial distress, and the targeting of consumers identified as vulnerable.

198. Defendant's intrusion would be highly offensive to a reasonable person. The following factors, considered together, establish the highly offensive nature of Defendant's conduct:

a. The sensitivity of the information intercepted. The data at issue concerns users' household purchases and consumption decisions—information that discloses health conditions, pregnancy and infant care, children's ages, religious observance, and

financial condition, and that can subject individuals to differential pricing, discrimination, and exploitation if disclosed.

b. The context of the intrusion. Users engaged with the Apps in the expectation that they were communicating privately with a retailer—not broadcasting the details of their household purchases to the world's largest advertising companies. The Apps invited users to browse, search, and transact, and to supply payment, shipping, and location information; Defendant exploited that trust by diverting those communications to Meta, TikTok, and LogRocket.

c. The deceptive means of intrusion. Defendant did not merely fail to disclose the interception; it structured the Apps so that no disclosure of its data-sharing practices was ever placed before a user, and then presented users with a purported notice of terms that could not be opened. Users had no reasonable means of discovering the embedded Tracking Technologies or the data transmissions without conducting a technical analysis of the Apps' network traffic.

d. The scope and persistence of the intrusion. The Tracking Technologies intercepted user data continuously—from the moment a user opened the App and throughout every subsequent session—thereby capturing a comprehensive record of each user's shopping activity, including every product considered, every cart addition, and every purchase completed and its value.

e. The independent commercial exploitation of the intercepted data. Meta and TikTok did not merely receive and store the data on Defendant's behalf but incorporated the intercepted communications into their own advertising ecosystems, thereby creating detailed, cross-platform behavioral profiles of individual users, which were then made available to unrelated third-party advertisers for targeted advertising, retargeting, and campaign optimization.

199. Defendant's intrusion was intentional. Defendant made a deliberate business decision to embed the Facebook Pixel and Facebook SDK, the TikTok Pixel, and the LogRocket session replay software within the Apps, to configure those tools to capture users' private communications, and to enable the transmission of that data to Meta, TikTok, and LogRocket for advertising, analytics, and session-recording purposes—all while placing no disclosure of that conduct before users and presenting them with a purported notice of terms that could not be opened.

200. As a direct and proximate result of Defendant's intrusion upon the seclusion of Plaintiff and Class members, Plaintiff and Class members have suffered damages, including but not limited to loss of privacy, loss of control over their Sensitive Information, the unauthorized

construction of advertising profiles incorporating their private communications, the receipt of targeted advertisements derived from their intercepted personal data, and anxiety and emotional distress regarding the unauthorized disclosure of their Sensitive Information.

**COUNT VII**
**INVASION OF PRIVACY**
***(On Behalf of Plaintiff & the Nationwide Class, or Alternatively on Behalf of the California Subclass)***

201. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

202. Plaintiff and Class members had a reasonable expectation of privacy in their Sensitive Information on the Apps, which they used to browse, search for, and purchase merchandise.

203. Defendant intentionally intruded upon the private affairs of Plaintiff and Class members by secretly embedding the Facebook Pixel and Facebook SDK, the TikTok Pixel, and the LogRocket session replay software within the Apps, which intercepted and transmitted users' Sensitive Information to Meta, TikTok, and other third parties without their knowledge or consent.

204. Defendant's intrusion into the private affairs of Plaintiff and the Class would be highly offensive to a reasonable person.

205. Users of a retail shopping application have a heightened expectation that their activities within that application—including the specific products they browse, the prices they are willing to pay, the contents of their carts, and the purchases they complete—will remain private.

206. As a direct and proximate result of Defendant's invasion of privacy, Plaintiff and Class members have suffered damages, including but not limited to the loss of privacy and the unauthorized disclosure of their private information.

**COUNT VIII**

UNJUST ENRICHMENT
***(On Behalf of Plaintiff & the Nationwide Class, or Alternatively on Behalf of the California Subclass)***

207. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

208. Defendant received a benefit from Plaintiff and Class members in the form of their Sensitive Information, which Defendant transmitted to Meta, TikTok, and LogRocket, and in exchange for which Defendant received advertising revenue, analytics services, and other valuable consideration from those third parties.

209. Defendant's retention of the benefits conferred by Plaintiff and Class members—namely their Sensitive Information—is inequitable and unjust because Defendant obtained those benefits through the secret interception and transmission of users' private communications without their knowledge or consent, and without disclosure in its Privacy Policy or anywhere else.

210. Plaintiff and Class members are entitled to disgorgement of the revenues and profits Defendant obtained as a result of its unjust enrichment.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Tamara Rubio, individually and on behalf of the Classes, respectfully requests that this Court enter judgment against Defendant Five Below, Inc. and award the following relief:

A. An order certifying the Classes as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. A declaration that the terms Defendant purports to present to users on the App download screen and at checkout—including any arbitration provision, class-action waiver, jury-trial waiver, limitation of liability, forum-selection clause, and consent-to-data-sharing provision contained in or incorporated by them—are unenforceable for lack of mutual assent;

C. Statutory damages under the ECPA, 18 U.S.C. § 2520(c)(2), of the greater of $100 per day of violation or $10,000 for each Class member, plus punitive damages;

D. Damages under WESCA, 18 Pa. C.S. § 5725(a), of actual damages but not less than liquidated damages computed at the rate of $100 per day of violation or $1,000, whichever is higher, for each Nationwide Class member, plus punitive damages;

E. Statutory damages under CIPA, Cal. Penal Code § 637.2(a), of $5,000 per violation for each California Subclass member, and treble damages for any actual damages sustained;

F. Restitution and injunctive relief under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17203, including disgorgement of the monies and benefits Defendant obtained by means of its unfair competition;

G. Compensatory and consequential damages in an amount to be determined at trial;

H. Disgorgement of Defendant's ill-gotten revenues and profits;

I. Injunctive relief requiring Defendant to cease the unauthorized interception and transmission of users' data to Meta, TikTok, LogRocket, and other undisclosed third parties, to cease recording users' sessions in the Apps, to remove the Tracking Technologies from the Apps, to disclose its data-sharing practices to users at or before the point of collection, and to repair the non-functional terms-review and terms-acceptance elements in the Apps so that users can actually read and accept or decline the terms presented to them;

J. Pre-judgment and post-judgment interest as allowed by law;

K. Reasonable attorneys' fees and litigation costs pursuant to 18 U.S.C. § 2520(b)(3), 18 Pa. C.S. § 5725(a)(3), Cal. Penal Code § 637.2, and Cal. Code Civ. Proc. § 1021.5; and

L. Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the Classes, hereby demands a trial by jury on all issues so triable.

Dated: September 29, 2026

Respectfully submitted,

*By: /s/ Liberato P. Verderame*
Liberato P. Verderame (Pa. ID. No. 80279)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N 300
Newtown, PA 18940
T: (215) 867-2399
Email: lverderame@edelson-law.com

David S. Almeida (*pro hac vice* forthcoming)
Lucas Coughlin (*pro hac vice* forthcoming)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Telephone: (708) 437-6476
david@almeidalawgroup.com

luke@almeidalawgroup.com

*Counsel for Plaintiff & Proposed Classes*